UNITED STATES of America,
Plaintiff,

v.

NEWPORT NEWS SHIPBUILDING,
INC., Defendant.

No. CIV.A. 03–142–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 14, 2003.

Craig Paul Wittman, Office of the United States Attorney, Peter D. Keisler, Assistant Attorney General, U.S. Dept. of Justice, Civil Div., Paul J. McNulty, United States Attorney, Eastern Dist. of Virginia, Michael F. Hertz, Alan E. Kleinburd, David Sadoff, J. Chris Larson, Joel D. Hesch, U.S. Dept. of Justice, Civil Div., Commercial Litigation Branch, Fraud Section, Norfolk, VA, for Plaintiffs.

James J. McCullough, Deneen J. Melander, David Scott Gallacher, Fried Frank Harris Shriver & Jacobson, Washington, D.C., for Defendants.

## *MEMORANDUM OPINION*

ELLIS, District Judge.

At issue on summary judgment in this False Claims Act (FCA) case [1] is whether Newport News Shipbuilding, Inc. (NNS) violated the Federal Acquisition Regulation (FAR) by misclassifying as Independent Research and Development (IR & D) approximately $74 million that was allegedly spent in connection with the design and construction of double-hulled tankers for commercial customers. Resolution of this question requires the interpretation and application of a long-questioned aspect of the FAR's definition of IR & D, specifically the exclusion from IR & D of efforts "required in the performance of a contract." 48 C.F.R. § 31.205–18(a).

Also at issue on summary judgment is whether the FCA claims must be dismissed on the ground that the undisputed evidence establishes that NNS did not "knowingly" submit false claims, as required by the FCA. 31 U.S.C. § 3729(a).

Following an initial hearing on these motions on Friday, July 18, 2003, supplemental briefing was requested and the hearing continued on Monday, July 21, 2003, at which time the motions were decided from the bench and an order issued.[2] This memorandum opinion elucidates the bases for those bench rulings.

**1.** The government also asserts related contractual and common law claims. The first amended complaint contains the following claims:

> Count I: Presentation of False Claims, 31 U.S.C. § 3729(a)(1)
> Count II: Use of False Statements, 31 U.S.C. § 3729(a)(2)
> Count III: Use of False Records to Decrease Obligation, 31 U.S.C. § 3729(a)(7)
> Count IV: Unjust Enrichment
> Count V: Payment Under Mistake of Fact
> Count VI: Breach of Contract

**2.** *See United States v. Newport News Shipbuilding, Inc.,* Civil Action No. 03–142–A (E.D.Va. July 21, 2003) (Order).

## I.

Defendant NNS is a major defense contractor whose chief business is the design, construction, repair, overhaul and re-fueling of nuclear-powered aircraft carriers and submarines for the United States Navy. During the time period relevant to this action, most of NNS's yearly revenues, between 85% and 99%, came from its contracts with the Navy. Most the contracts are flexibly-priced contracts, under which NNS charges the government on an ongoing basis based on its reasonable, allocable, and allowable costs, as determined according to the FAR 48 C.F.R. §§ 1.000 et seq. These costs include (i) direct costs that are directly identified with and charged to a specific contract, such as material and labor costs, and (ii) indirect costs that are allocable to more than one contract, including overhead and general administrative costs, which must be allocated to the various applicable contracts. IR & D costs, the subject of this dispute, are indirect costs.

For the period between 1994 and 1999, NNS submitted invoices for progress payments on a bi-weekly or monthly basis. At the end of each year, NNS submitted a final indirect cost proposal, which certified that the submitted indirect costs were allowable in accordance with the FAR. The central question at issue here is whether NNS's claims for progress payments and year-end certifications submitted from 1994 and 1999 were false, because they contained IR & D charges for efforts related to NNS's Double Eagle commercial tanker program that were not allowable as IR & D under the FAR.

Although both parties agree on some of the essential facts in this dispute, and although there is a voluminous factual record accompanying the summary judgment motions, there remain disputed factual issues material to certain aspects of the case. As the following summary indicates, substantial factual questions remain regarding such central facts as (i) the nature and intent of NNS's Double Eagle class design efforts, (ii) the content of the advice NNS received regarding the regulation and its charging practices, (iii) whether NNS followed that advice, and (iv) when and to what extent NNS disclosed its IR & D charging practices regarding the Double Eagle IR & D to the government.

### A. NNS's Double Eagle tanker program

The genesis of this dispute is NNS's ultimately unsuccessful attempt to re-enter the commercial shipbuilding market. Although it had earlier withdrawn from the commercial shipbuilding market, NNS, in the early 1990's, decided to return to commercial shipbuilding, specifically to build double hulled oil tankers to be known as Double Eagle tankers. NNS asserts that this decision to design, market, and sell the Double Eagle tankers was part of a larger effort undertaken by NNS to transform itself into a world-class shipbuilder capable of competing with shipbuilding yards in Asia and Europe. NNS argues that the intent, from the outset, was to invest significantly to create a "class design" for the Double Eagle tankers and to transform its shipbuilding operations to become more competitive and efficient. Thus, NNS paints a picture of a tanker class design effort that was independent from the efforts undertaken to fulfill the specific Double Eagle contracts, which contracts materialized after the commencement of the class design effort.

The government's view is quite different; it disputes the existence of a truly independent class design effort, contending that NNS simply created "contract-level" plans for a "proposed class" of ships which it intended to market to potential customers, and that it chose to pursue a class design in order to shift design costs

from money-losing commercial contracts into general IR & D chargeable to government contracts. Thus, the government does not agree that NNS worked to develop a generic class design separate and independent from the specific commercial contracts received by NNS to build the Double Eagle tankers.

By March 1994, NNS had completed some market research and preliminary design work on the Double Eagle tanker, and, at that time, began to seek funding for the project and to market the new tankers to potential customers. On March 15, NNS issued a press release publicly announcing its Double Eagle tanker program. On March 18, 1994, NNS submitted a proposal for funding under the United States Advanced Research Projects Agency (ARPA)'s Maritech Program, setting out its plan to enter the commercial shipbuilding market with the a "42,000 dwt product tanker" as the "initial target market ship," and stating that "NNS has already developed a concept design for such a ship, the Double Eagle 333." And, on March 21 and 22, 1994, NNS presented a model of the Double Eagle tanker at an industry trade show, and quickly thereafter became involved in discussions with various potential commercial customers for its new tankers.

Beginning on January 4, 1993, NNS charged the costs of its preliminary design efforts for what became the Double Eagle tanker project to various IR & D accounts. On May 12, 1994 NNS issued IR & D Job Order 2858, the first IR & D job order to contain charges disputed in this matter. Job Order 2858, entitled "Develop Product Carrier Design Process," was intended to capture the costs of NNS's efforts to "complete the preliminary design of the Newport News Standard Products Carrier and to establish the process for transferring from preliminary design to detail design."

On May 20, 1994, shortly after Job Order 2858 was issued, NNS signed a letter of intent (LOI) with Eletson Corporation, a Greek shipper, to negotiate contracts for the construction of four Double Eagle tankers suitable for the international tanker market at a price of $36 million each. This price represented a premium of $3 to $4 million per ship over the then-prevailing market price for comparable ships built in Asia and elsewhere. According to the government, NNS had not prepared a cost breakdown prior to signing the letter of intent; NNS, however, disputes this contention. At any rate, a cost estimate spreadsheet was prepared in this general time frame, although it is unclear whether this occurred before or after the LOI was signed. This cost estimate indicates that NNS would lose money at the $36 million price, even assuming NNS received an $8 million in funding from the Maritech Program and various other cost-saving assumptions.[3]

The government asserts that NNS thereafter decided to budget the design and planning effort required for the Eletson ships under IR & D. In this regard, the cost estimate prepared at the time of the Eletson LOI budgeted 120,000 hours of engineering for the first Eletson ship, and only 9,000 to 5,000 for the next three ships. Thus, the initial cost estimate ap-

---

**3.** More specifically, the spreadsheet indicates that, if NNS were to build *six* of the proposed ships, the "book cost" per ship would be approximately $59 million; the "possible cost," assuming an $8 million Maritech grant, 25% productivity improvement, and other cost savings, was estimated to be approximately $45 million per ship; the "future cost," assuming future improvements, would amount to approximately $41 million per ship, and the "potential cost," assuming yet further reductions in cost, was estimated to be approximately $38 million per ship. According to NNS, it was notified of a $3 million Maritech award on May 25, 1994.

pears to have allocated the cost of the initial design and planning effort directly to the Eletson contracts. By contrast, a later NNS budget dated May 1995 allocates only 10,000 hours of engineering for the first Eletson ship and 5,000 to 3,000 engineering hours for the next three ships. For its part, NNS contends that it had always planned to continue charging the design and planning costs for the Double Eagle class design to IR & D, even after contracts for individual Double Eagle tankers were signed. According to NNS, its plan throughout was to charge directly to the Eletson contracts only those design and planning efforts necessary to customize the class design to Eletson's specifications. In other words, NNS contends that it its intent was always to use the output of its generic Double Eagle class design efforts in constructing the Eletson ships, to the extent the Eletson ships were identical to the class design.

As noted, the government contends that NNS did not engage in any class design effort independent of the effort to design and build the Eletson ships. In this regard, the government points out that the concept design for the Double Eagle tanker class marketed by NNS was substantially modified by NNS in response to its ongoing negotiations with Eletson. According to an NNS internal report, Eletson requested several changes to the concept design to make the ship appropriate for the international market, including a reduction in ship speed from 16 knots to 14.5 knots, a wider beam, and a centralized pump room. For its part, NNS contends that these changes were not "substantial" modifications.[4] Moreover, while NNS concedes that the class design was modified to incorporate some of Eletson's require-

ments, NNS nonetheless contends that Eletson's requirements were incorporated in the class design only to the extent that market research indicated that the marketplace agreed the modifications were necessary. According to NNS, Eletson's requests for modifications that were not useful to the class design were not included in the class design and the design and engineering costs associated with those modifications were not charged to IR & D, but were charged to the Eletson ships directly.

On October 31, 1994, NNS signed four separate contracts with four corporations affiliated with Eletson for the construction of four Double Eagle tankers. Each contract specified that NNS would "design, construct, equip and complete one (1) 46,-500 metric ton deadweight single screw diesel driven oil/petroleum carrier" in accordance with specifications incorporated into the contract. All four contracts also specified a "purchase price" of $36 million, which some included "the expenses for basic designs and supply of drawings, inspections, tests, surveys, classification of the Vessel and all required certificates other than Class and the technical services required to be rendered to the Purchaser under the terms of the Contract."

On November 2, 1994, shortly after the Eletson contracts were signed, NNS established Job Orders 647C and 648C (Hull Job Orders) for "costs specifically for the construction" of the tankers. The Hull Job Orders indicated that "all costs for planning and development of the Standard Double Eagle Tanker Program (including complete detail design, developing product model and build strategy and purchase order preparation up to placement)"

---

4. As discussed *infra,* however, the modifications Eletson required for the international market, particularly the reduction in operating ship speed, were substantial enough to merit the development of a separate design class for domestic tankers after NNS signed the Van Ommeren contracts.

should be charged to IR & D Job Order 2858, not the Hull Job Orders.

On November 21, 1994 NNS modified and expanded IR & D Job Order 2858. The original project objective, established May 12, 1994, was "to complete the preliminary design ... and establish a process for transferring from preliminary design to detail design." The modified objective was "to develop a 'world class' design" for a "double hulled ... petroleum product tanker," resulting in a "complete" design, "including model testing, detail drawings, detail specifications, and particulars for all equipment," as well as a "build strategy." Then, on March 13, 1995, NNS further modified Job Order 2858, changing the title to "Development of the Double Eagle Class of Product Carriers," and stating as the objective the "research and development of the Double Eagle 300 Class of vessels" including "design, prototyping, development, testing, and evaluation to provide completed designs to be used to produce the new class of ships for sale." Whereas the government stresses that the March 13, 1995 modification is the first time that Job Order 2858 referenced a "class design," NNS disputes the significance of this change in terminology, arguing that NNS's the purpose of Job Order 2858 was always to record the costs of creating a class design for a series of commercial tankers.

In 1994, NNS charged IR & D Job Order 2858 for the cost of 78,619 engineering hours and 9,529 production hours. The government contends that these charges were incurred to prepare drawings and Detail Specifications necessary to negotiate contracts with Eletson, and to respond to Eletson's requests for modifications of the design. NNS contends that these charges were part of its ongoing Double Eagle "class design" efforts and its larger efforts to modernize and transform its shipbuilding techniques.

In September of 1994, NNS began contract negotiations with Van Ommeren Shipping, Inc. Van Ommeren was interested in tankers for use in the domestic trade, and as such wanted ships built to standards and specifications different from those of the Double Eagle ships being designed and built for Eletson. For example, Van Ommeren required tankers with an operating ship speed of 16 knots rather than 14.5 knots, and this change in turn required considerable redesign of the Eletson Double Eagle tanker. A February 7, 1995 Memo from M.L. Powell, NNS's director of new product engineering, estimated that modifying the Double Eagle plans to meet Van Ommeren's specifications would require 86,565 engineering hours and more than 50,000 computer design hours. Indeed, the ships requested by Van Ommeren differed so greatly from those being designed and built for Eletson that NNS classified them as a second class, namely "Domestic Double Eagle tankers," and began referring to the Eletson ships as "International Double Eagle tankers."

On March 17, 1995 NNS signed a letter of intent with Van Ommeren to continue good faith negotiations to reach a contract for five Domestic Double Eagle tankers for a price of $40.7 million per vessel. On August 31, 1995, NNS issued IR & D Job Order 2875, titled "Development of the U.S. Flag Double Eagle Class of Product Carriers," intended to include costs for the "design, prototyping, development, testing and evaluation to provide a complete design for a new class of ships for sale."

On November 21, 1995, NNS entered into five separate contracts with Van Ommeren for Domestic Double Eagle tankers, at the price of $42.9 million per ship. Each contract specified that NNS would "design, construct, equip and complete one (1) single screw diesel driven crude oil and

oil products carrier." Each contract also specified that the "Contract Price shall include the expenses for the supply of drawings, inspections, tests, surveys, classification of the Vessel, the technical services required to be rendered to the purchaser under the terms of this Contract and all required certificates other than documentation."

A January 19, 1996 NNS memo contains the "recommended Contract Price Breakdown and Budgets" for the Van Ommeren tankers. It budgets only 10,000 engineering hours for the first ship and 3,500 for each of the following four ships, far less than the total engineering hours estimated in the February 7, 1995 Powell memorandum, while explaining in a footnote to these figures that the "Detail design [will be] charged to IR & D." Thus, as with the Eletson tankers, the bulk of the detailed design work necessary to develop the Van Ommeren tankers, *i.e.,* the Domestic Double Eagle class tanker, was charged to IR & D Job Order 2875, not the individual Hull Job Orders for the five Van Ommeren tankers.

Despite negotiations with other potential commercial customers, NNS did not reach any further agreements to build Double Eagle tankers. Finally, in March 16, 1998, NNS decided to abandon its commercial tanker venture and announced that it was leaving the commercial shipbuilding market. On March 25, 1998, NNS issued IR & D Job Order 3102, entitled "Completion of Double Eagle Design," to accumulate the costs "to complete the International and Domestic Double Eagle Tanker designs to support the disposition of material and to document the designs sufficient for the sale or future use of such designs." As of April 1, 1998, IR & D Job Order 3102 superceded Orders 2858 and 2875. The government contends that further engineering efforts for the International and Domestic Double Eagle tankers built un-

der the Eletson and Van Ommeren contracts were charged under 3102, while NNS maintains that 3102 was created after the ships had been substantially completed and that none of the tasks charged to 3102 were performed in furtherance of the contracts to build the nine ships, but rather were tasks required to finish the class designs so these designs could be preserved in corporate memory and possibly transferred, sold, or resuscitated at some later date.

In total, NNS charged over $33 million to the International Double Eagle IR & D Job Order 2858, over $40 million to the Domestic Double Eagle IR & D Job Order 2875, and over $2 million to the Completion of Double Eagle Design Job Order 3102. All of these charges were allocated to IR & D, and thus placed in NNS's general overhead and allocated to all of its work. As a result, the vast majority of the IR & D costs under Job Orders 2858, 2875, and 3102 were billed to the government pursuant to NNS's flexibly priced government contracts. Specifically, the government points out that the record reflects that 1,640,990 hours of design and engineering work attributable to the Eletson and Van Ommeren ships and contracts were charged to the government as IR & D, while only 216,710 hours of engineering work were charged directly to the individual contracts. Thus, the government contends that of all the engineering work necessary to build the Eletson and Van Ommeren ships, only 12% was directly charged to the contracts.

NNS, for its part, disputes the government's classification of all of this engineering work as necessary to build the ships and also provides somewhat different figures for the breakdown in hours. NNS cites its expert Dr. Fisher to the effect that 1,758,424 hours of engineering effort were charged to the class design under the three IR & D job orders, while 219,696

hours of engineering effort were charged to individual hulls under contract.

### B. NNS's Decision to Continue Charging Double Eagle Design Effort as IR & D

To prevail on its claims under the False Claims Act, the government must show not only that NNS misclassified Double Eagle design costs as IR & D under the FAR, but also that NNS did so "knowingly." 31 U.S.C. § 3729(a). Thus, the record contains extensive evidence, much of it in dispute, regarding NNS's decision to continue charging Double Eagle design costs as IR & D after NNS signed commercial contracts with Eletson and Van Ommeren to build the ships. At issue, in particular, on the question of whether false claims were "knowingly submitted, is the nature and content of the advice NNS sought and received regarding the IR & D classification, the reasonableness of NNS's reliance on that advice, and when and to what extent NNS disclosed its accounting practices to the government."

As more fully discussed *infra*, efforts "required in the performance of a contract" may not be charged as IR & D under the FAR. 48 C.F.R. § 31.205–18. Thus, once NNS signed the Eletson contracts, NNS faced the question whether it could properly continue to charge its Double Eagle design efforts under IR & D. According to NNS, once the contracts were signed it set out to determine whether the existence of these contracts altered the IR & D analysis and required more restrictive use of the IR & D category. In this regard, NNS solicited opinions and advice from two sources, namely its Assistant General Counsel, Doyle Huneycutt, and an outside expert, William T. Keevan, the managing partner in Arthur Andersen's Government Contracting Consulting Services Group.

Huneycutt indicates in an affidavit that, "based upon what [he] considered to be a thorough and diligent legal review," he advised the management of NNS that "it would be appropriate to account for the costs of designing a new class of Double Eagle tanker ships as Independent Research and Development." Huneycutt further avers that he was aware of "considerable confusion within the industry" concerning the interpretation of the FAR's exclusion from IR & D of work "required in the performance of a contract." The record does not contain further specifics regarding the basis of Huneycutt's conclusions, nor further details of the content of the advice he provided to NNS.[5]

A March 15, 1995 memorandum written by Ronald Ward, NNS's Vice President of Contracts, asserts that "[t]he point at which charging to IR & D stops and direct charging to the contract begins, is perhaps the most difficult to determine from the regulations," and that "multiple interpretations are possible." The memorandum states that there is (1) a "restrictive interpretation," according to which "once the product development is sufficient to result in the sale of a product, the seller has a contractual commitment to do everything else necessary to permit the building and delivery of the product to the buyer," and can no longer charge such efforts as IR & D; and (2) a "liberal interpretation," under which, "even after there is a contractual requirement to complete the product de-

---

**5.** The current record is sparse because the government initially failed to depose Huneycutt on these questions, believing, not without some cause, that NNS was asserting attorney-client privilege with regard to Huneycutt's advice and not relying on an advice-of-counsel defense. Although the government's motion in limine to exclude evidence regarding Huneycutt's advice was denied, the government was granted further discovery on this issue, including the opportunity to depose Huneycutt. *See United States v. Newport News Shipbuilding, Inc.*, Civil Action No. 03–142–A (E.D.Va. July 21, 2003) (Order).

velopment/design, any development/design that is generic in nature and applicable to the product as it will be offered to other potential customers is allowable as IR & D." Ward further noted in his memorandum that the government was advancing the restrictive interpretation in the then-ongoing *Mayman* case,[6] and he concluded that "NNS is at liberty to make its own reasonable interpretation of the regulations."

At the time the Ward memorandum was issued, in mid-March 1995, NNS retained an outside expert, William T. Keevan,[7] to review its IR & D accounting practices. After several months of review by Keevan and his associates, Keevan presented his findings and conclusions at a meeting with NNS management on August 16, 1995. The parties dispute both the specific content and the general character of Keevan's advice to NNS, which was delivered orally but never reduced to a writing.

According to NNS, the evidence indicates that Keevan and Arthur Andersen approved NNS's Double Eagle IR & D charging practices. Relying on Keevan's deposition testimony and the affidavits of NNS managers, NNS asserts that Keevan provided the following specific advice:

First, he laid out three factors he relied on to determine whether an effort was "required in the performance of a contract" and thus not chargeable to IR & D, (i) whether the effort was found in the contract's statement of the work, (ii) whether the effort was included in the price of the contract, and (iii) whether the effort was a deliverable of the contract. Second, Keevan applied these factors to the Eletson contracts and concluded that the Double Eagle class design efforts being charged under IR & D were not required by the Eletson contracts, (a) because the contract called for the delivery of constructed ships, not the delivery of a design, (b) because the $36 million price did not include design costs, and (c) because the class design was not a deliverable under the contract. Third, Keevan testified that he advised NNS that the Eletson contracts' references to "design" were intended only to clarify that the buyers would not supply the design and that NNS would maintain all intellectual property rights to the Double Eagle tanker design upon completion of the contract. Next, Keevan testified that he explained to NNS that the government often takes an opposing view of the regulation and that the Defense Contract Audit Agency (DCAA)[8] might challenge

6. An opinion in that case, denying the defendant's motion to dismiss, was issued shortly thereafter on April 27, 1995. *See United States ex rel. Mayman v. Martin Marietta,* 894 F.Supp. 218, 222 (D.Md.1995).

7. Keevan, the managing partner of Arthur Anderson's Government Contracting Consulting Services Group, has significant experience with government contracting and the FAR. He was the principal author of the auditing chapter of the American Institute of Certified Public Accountants (AICPA) publication *Audits of Federal Government Contractors* and directed the 1986 *Study of Government Audit and Other Oversight Activities related to Defense Contractors* for the President's Blue Ribbon Commission on Defense Management (the "Packard Commission"). Keevan was twice the AICPA's nominee to the Cost Ac-

counting Standards Board, and was a member of the Advisory Board of *Government Costs, Pricing, & Accounting Report.* Before being retained by NNS, Keevan had worked on a number of other engagements involving the interpretation of FAR 31.205–18 and had collected and reviewed over thirty IR & D and B & P policies for various government contractors.

8. DCAA is a separate agency in the Department of Defense, and serves as the accounting branch of DOD. One of DCAA's functions is to audit defense contractors' books and records to establish what costs are allowable under the FAR. *See United States v. Newport News Shipbuilding and Dry Dock Co.,* 862 F.2d 464, 465 (4th Cir.1988).

NNS's charging the costs to IR & D. Nonetheless, Keevan testified that he told NNS that he considered his interpretation of the FAR to be in line with the applicable law, including specifically the then-recent decision in *United States ex rel. Mayman v. Martin Marietta Corp.*, 894 F.Supp. 218 (D.Md.1995). Finally, Keevan further stated that in addition to this advice to NNS, he offered various recommendations, including that NNS's formal IR & D written policy should be updated, that NNS should consider disclosing its IR & D policy to the government, and that a management group be formed to monitor IR & D and B & P charging.

The government disputes NNS's characterization of Keevan's review of NNS's Double Eagle IR & D charging policies, arguing that Keevan's approval was qualified and contained strong warnings. The government relies largely on a contemporaneous Arthur Andersen memorandum, which appears to be an outline of Arthur Andersen's review of NNS's charging practices.[9] The outline does not describe the three factor test for "required in the performance of a contract" described by Keevan in his depositions. Yet, in a section entitled "IR & D vs. Eletson contract costs," the outline does note a qualified approval of NNS's approach and lists a number of specific "issues," as follows:

(i) **In general, we believe that NNS's approach to accounting for the design effort is theoretically appropriate (subject to the disclosure discussed below).** [bold in original]

(ii) The Government in a current high profile concurrent IR & D case [the *Mayman* case] is taking the position that if effort under IR & D must be performed to successfully meet contract requirements, that effort should be charged to the contract. Under this interpretation, NNS must charge the design effort to the contract . . .

(iii) The Eletson contract states that NNS will "*design*, construct, equip, and complete" the tanker (emphasis added). This supports the Government's position.

(iv) **NNS should consider disclosing its approach to the Government** . . . [bold in original]

(v) As the ship enters the production phase, there will be more potential for mischarging due to confusion and uncertainty that may arise among employees . . . . Examples of current Eletson "gray areas" include:

- ABS qualifications
- Procurement
- Future design changes to product class tankers
- Jameston Metal Marine Sales

The Arthur Andersen outline also states that "NNS has not notified the Government of its accounting treatment." Finally, the memorandum states that an issue to be discussed during the "Wrap-up" of the meeting was the "[f]ormat and timing of the AA LLP report, if any." As noted above, no written report was generated as a result of the Arthur Andersen review.

NNS presents a series of documents to support its contention that NNS disclosed to the government that it was continuing to charge design efforts as IR & D after the award of the Eletson contracts on October 31, 1994. Thus, for example, in a November 28, 1994 letter to the Naval

---

**9.** NNS not only disputes the government's characterization, but also disputes that the outline is an accurate reflection of the advice Keevan provided NNS at the meeting. At his deposition, Keevan denied that he relied on or read the outline at the August 16, 1995 meeting, but did concede that the document was prepared for him, that he had it with him when he made his remarks, and that it served as a "memory jogger."

Surface Warfare center, NNS stated that "[o]ur intent is to continue use of the single IR & D account to collect the costs of this project." Although this letter did make it into DCAA's files on NNS, the letter was not addressed to DCAA nor did it clearly reference the existing contracts with Eletson, which had been signed one month earlier, or describe the types of Eletson-related charges that were then routinely labeled as IR & D.

Next, NNS notes the March 15, 1995 version of IR & D Job Order 2858 states that "THIS JOB ORDER *DOES NOT* INCLUDE THE COSTS OF EFFORT SPONSORED BY A GRANT OR REQUIRED IN THE PERFORMANCE OF A CONTRACT," and that "[a]fter award of a shipbuilding contract, effort to modify the Class Design developed under this job order (or to develop new designs) which will *not* be incorporated into the Class Design, *must* be charged to the Hull and Cost Class and *not* to IR & D or B & P." NNS asserts that DCAA had a copy of this job order in its files by December 21, 1995.

Furthermore, NNS relies on its February 21, 1996 memorandum summarizing a meeting between NNS management and Tom Segroves, the resident DCAA auditor. This memorandum reflects that Segroves stated at that time that DCAA "may have some concerns regarding IR & D." In response, NNS claims it informed Segroves that NNS could provide DCAA with copies of NNS's specific charging instructions and the formal IR & D policy and procedure once it issued. The memorandum lists IR & D charging as only one of many outstanding issues between NNS and DCAA, and makes no specific reference to the Double Eagle class design project or the Eletson and Van Ommeren contracts.

Finally, NNS cites a July 9, 1997 meeting between DCAA and NNS, the subject of which appears to have been DCAA's "concerns" regarding "[w]hat NNS [was] charging to IR & D" with regard to the Double Eagle tankers. The minutes of this meeting indicate that NNS set forth its class design justification for charging design efforts for the Double Eagle tankers under IR & D, and that a discussion of the implementation and implications of the class design IR & D charges then ensued between DCAA and NNS. The DCAA auditors followed up with a number of specific questions, clearly indicating that DCAA by this time was involved in an investigation of the Double Eagle IR & D charges. The minutes also reflect that DCAA requested certain information from NNS, namely "[c]hange orders to the international and domestic contracts," the section function and quality codes used from 1994–1997, Arthur Andersen's opinion regarding IR & D Job Orders 2858 and 2875, cost figures related to the conceptual design of the tankers prior to the May 1994 Eletson LOI, and responses to DCAA's earlier information requests dated July 1, 1996 and April 14, 1997.

## C. Procedural History

The government initiated this action on February 3, 2003, asserting violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1), (2) & (7), unjust enrichment, and payment under mistake of fact. The complaint was amended on April 21, 2003, to add a claim for breach of contract.

The matter has been intensely litigated throughout. On March 14, 2003, NNS's motion to dismiss the complaint on the ground that the government had not stated its FCA claims with sufficient particularity was denied.[10] And, on April 11,

---

10. *See United States v. Newport News Shipbuilding, Inc.,* Civil Action No. 03–142–A (E.D.Va. March 14, 2003) (Order).

2003, NNS's motion to dismiss claims barred by the FCA's statute of limitations was granted in part, barring any claims which were submitted and paid prior to December 15, 1995.[11] Subsequently, NNS filed a motion to dismiss to strike the government's quasi-contractual claims, while the government filed a motion to strike affirmative defenses. In the interests of avoiding further piecemeal pleadings, these motions were deferred pending the parties' submission of summary judgment motions, and a schedule for such motions was set.[12] Pursuant to that schedule, the parties submitted cross motions for summary judgment, which were argued orally on July 18, 2003.

The government moved for partial summary judgment on the question whether NNS's classification of the disputed Double Eagle tanker program costs as IR & D was a violation of the FAR. For its part, NNS moved for summary judgment on all counts, contending to the contrary that its classification of those costs was entirely proper under the FAR. In the alternative, NNS moved for summary judgment on the FCA claims, arguing that even assuming the IR & D costs were improper under the

FAR, the undisputed evidence established the NNS did not "knowingly" submit false claims, as required by the FCA. 31 U.S.C. § 3729(a).[13] Thus, resolution of these cross motions for summary judgment requires a consideration of (i) the falsity element of the FCA counts, namely whether some or all of NNS's IR & D charges were proper under the FAR or not, and (ii) the knowledge element of the FCA counts, namely whether NNS submitted any such false claims "knowingly," as required by the FCA. Each is discussed separately below.

**II.**

To prevail on its FCA claims, the government must show that NNS "knowingly present[ed] or cause[d] to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1).[14] Thus, as an essential element of its FCA claims, the government must show that NNS knew that the disputed IR & D charges were improper under the FAR and therefore false. The falsity of the disputed IR & D charges is also an essential element of the governments un-

**11.** *See United States v. Newport News Shipbuilding, Inc.,* Civil Action No. 03–142–A (E.D. Va. April 11, 2003) (Order). Significantly, NNS's year-end certifications of its indirect costs incurred during 1994 and 1995 were submitted on December 7, 1995 and September 30, 1996, respectively. Thus, none of the government's claims based on NNS's year-end certifications of its indirect costs are barred by the statute of limitations.

**12.** *See United States v. Newport News Shipbuilding, Inc.,* Civil Action No. 03–142–A (E.D.Va. May 2, 2003) (Order).

**13.** The parties also presented several additional motions. In the event the FCA claims were dismissed, NNS moved that for dismissal of the contractual and common law claims without prejudice to be heard by the board of contracts appeals pursuant to the Contracts

Disputes Act. 41 U.S.C. §§ 601–613. NNS also moved for dismissal of the quasi-contractual counts for unjust enrichment and payment under mistake of fact given the existence of express contracts. The government presented three motions in limine, regarding (i) the use of a summary exhibit, (ii) the exclusion of a defense expert witness, and (iii) the exclusion of evidence relating to the advice of NNS's in-house counsel, all of which were opposed. These motions were addressed in open court and are not discussed in this Memorandum Opinion.

**14.** The government's related false claims counts require proof that NNS knowingly made or used a false record or statement either to have a false claim paid by the government, 31 U.S.C. § 3729(a)(2), or to conceal, avoid, or decrease an obligation to pay the government, 31 U.S.C. § 3729(a)(7).

just enrichment, payment under mistake of fact, and breach of contract claims. More specifically, these cross motions for summary judgment turn, in part, on whether the Double Eagle design and engineering costs NNS charged as IR & D under Job Orders 2858, 2875, and 3102 are allowable under 48 C.F.R. § 31.205–18, the FAR definition of IR & D.

Consideration of this question must of course begin with an examination of the governing regulatory language. In this respect, the FAR defines IR & D as follows:

> *Independent research and development (IR & D)* means a contractor's IR & D cost that consists of projects falling within the four following areas: (1) Basi[c] research, (2) applied research, (3) development, and (4) systems and other concept formulation studies. The term does not include the costs of effort sponsored by a grant or required in the performance of a contract....

48 C.F.R. § 31.205–18. The question presented then is whether the efforts NNS charged as Double Eagle IR & D were "required in the performance of a contract," specifically the Eletson and Van Ommeren contracts. If so, the claims submitted by NNS to the government for reimbursement of those charges were in violation of the FAR. If not, then NNS's Double Eagle IR & D charges were proper, and the claims against NNS should be dismissed.

The phrase "required in the performance of contract," although seemingly straightforward, has been the subject of "considerable debate" and conflicting interpretations over the years. *See Mayman*, 894 F.Supp. at 222. The phrase may be read narrowly, excluding from IR & D only those efforts *"explicitly* called for in the contract," or it may be read more broadly, to exclude additionally "everything *implicitly* necessary to carry it out." *Id.* (emphasis added). Not surprisingly, civilian contractors have generally advocated the narrower interpretation of the exclusionary phrase, resulting in a broader scope of allowable IR & D charges, while the government has generally advocated the broader interpretation of the exclusionary phrase, resulting in a narrower scope of allowable IR & D charges.[15] A third approach to interpreting the phrase, resulting in the broadest possible scope for IR & D charges, focuses not on whether the effort is implicitly or explicitly required by the contract, but whether the effort is attributable to and required by a single contract, or whether the effort stands to benefit multiple existing contracts, or potential future contracts.[16] Under this interpretation, the existence of

---

15. *See* Thomas P. Barletta & Gerard E. Wimberly, Jr., Allowability of Independent Research and Development Costs under FAR 31.205–18: A Proposal for Regulatory Reform, 29 Pub. Cont. L.J. 113, 118–19 (1999) (noting that the line between contract research and development and independent research and development has been a matter of debate since 1970 and noting that the government "has tended" to endorse the implicit requirement reading, while "industry and most commentators have generally" endorsed the explicit requirement reading). Here, the government has advocated a reading of the phrase to include efforts implicitly necessary to perform the contract, while also arguing that many of the efforts charged as IR & D were explicitly required by the contract. NNS has advocated Keevan's interpretation, which focuses on the explicit requirements of the contract, namely whether the effort is designated in the statement of work, included in the contract price, or is a deliverable under the contract.

16. For example, the defendant in *Mayman* argued that the tasks charged to IR & D were relevant to potential future contracts, and thus should be billed as IR & D and not to one contract. *See Mayman*, 894 F.Supp. at 222. NNS advances a similar argument in its latest pleadings.

multiple contracts, as here, would suffice to allow labeling as IR & D all charges common to more than one contract.

Despite the long controversy over the proper interpretation and application of the regulatory phrase "required in the performance of a contract," the case law on this issue is sparse and ultimately not helpful. The *Mayman* case, the only published decision on the phrase's meaning, ultimately did not reach and decide the question presented here. *Mayman* involved a contract between the United States Navy and Martin Marietta Corporation to design and build a full-scale model of a target missile for missile defense testing. The government charged Martin Marietta with submitting false claims, alleging that Martin Marietta intentionally underbid the research and development contract and then impermissibly charged necessary research and design efforts to IR & D, rather than to the contract, as the FAR required. More specifically, the government claimed that the six tasks at issue, which Martin Marietta charged as IR & D, were required by the government's contract with Martin Marietta to design and build the target missile prototype. Yet, Martin Marietta sought a threshold dismissal, arguing that the six tasks, while required by that contract, could nonetheless be properly charged as IR & D because they had potential applicability to other future contracts. *See Mayman*, 894 F.Supp. at 221–22.

In denying Martin Marietta's motion to dismiss, the *Mayman* court noted that the facts, as alleged, did not require resolution of the implicit or explicit requirement question, since it was undisputed that the six tasks in issue were required by Martin Marietta's research and design contract with the government. *Id.* at 222. The *Mayman* opinion thus never reached or decided the question presented here, namely whether the phrase in the FAR

excluding from IR & D charges for efforts "required in the performance of a contract" reached those efforts implicitly required by the contract, as well as those explicitly required. The court explicitly set aside this question, while rejecting Martin Marietta's contention that potential benefit to future contracts was sufficient to qualify an effort as IR & D. *Id.*

A more recent, unpublished case involved the consideration of parallel language in the FAR's definition of Bid and Proposal (B & P) costs. *See United States ex rel. Bagley v. TRW, Inc.*, 2000 WL 33400196 (C.D.Cal.2000). The FAR's definition of B & P similarly excludes from B & P "the costs of effort sponsored by a grant or cooperative agreement, or *required in the performance of a contract.*" 48 C.F.R. § 31.205–18. (emphasis added). In *Bagley*, the defendant and another company entered into a Memorandum of Agreement (MOA) to create a limited partnership to develop a satellite-based telephone network. *Id.* at *2. Under the MOA, the defendant was allocated the task of developing a firm, fixed price proposal to build and sell the system to the partnership. *Id.* The *Bagley* court concluded that defendant's efforts in preparing the proposal were "required in the performance of a contract," namely the MOA, and as such were improperly charged as indirect B & P and passed off to the government. *Id; see also Boeing Co. v. United States*, 862 F.2d 290, 293 (Fed.Cir.1989) (holding that "B & P costs are normally allocable to an indirect account," but that "B & P costs arising from a specific requirement in an existing contract may be reallocated from the indirect cost account to the direct cost account"). The *Bagley* opinion, similar to *Mayman*, did not address the explicit or implicit interpretation, nor did it involve more than more than one existing contact requiring the effort. In addition, the *Bagley* opinion rejected that defendant's argument that "required in the performance of

a contract" means "actually paid for by a contract in which the buyer was required to pay." *Id.* at *6.

As there is no controlling Fourth Circuit precedent interpreting the relevant regulatory language, and the sparse case law on the subject provides little guidance, the language of the regulation itself must provide the authoritative guide to its meaning. Indeed, it is well established that "statutory analysis begins with 'the language of the statute.'" *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999). Moreover, "in the absence of an indication to the contrary, words in a statute are assumed to bear their 'ordinary, contemporary, common meaning.'" *Walters v. Metropolitan Educ. Enter.,* 519 U.S. 202, 207, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997). These principles, applied to the FAR's plain language, yield the following conclusions:

■ First, the exclusion from IR & D of the cost of efforts "required in the performance of a contract" must be read to include efforts which are not explicitly stated in the contract, but are nonetheless necessary to perform the contract and thus implicitly required by it. This follows from the plain language of the regulation itself. This language does not exclude from IR & D those efforts *"required by"* a contract, a phrase that might be read to refer only to efforts explicitly called for in the contract. Instead, the regulatory language excludes from IR & D all efforts "required *in the performance of* a contract." This locution plainly focuses the inquiry on all efforts required in *performing* the contract, not simply on efforts explicitly called for by the contract, whether designated in the contract's statement of work or required as an explicit deliverable. Although the regulation might have been even more explicit in its intent to reach implicit requirements, the plain meaning of "required in the performance of a contract" includes those efforts that are implicitly required to perform the work as well as those efforts explicitly called for in the contract.

■ Second, it is clear that the plain language of the regulation does not allow charging of research and design efforts as IR & D simply because they are a benefit to more than one existing contract. In this regard, NNS argues, unpersuasively, that because the FAR refers to the efforts "required in the performance of *a* contract," efforts that are required by more than one contract are legitimately charged as IR & D. NNS is reading too much into the indefinite article,[17] the regulation does not exclude only those efforts "required in the performance of a single contract," or "only one contract"; it excludes from IR & D all efforts required in the performance of "a contract." Moreover, the approach advocated by NNS could lead to the anomalous result that the signing of the first contract requiring the effort would render the effort no longer chargeable as IR & D, but the signing of a subsequent, additional contract would render the effort again chargeable as IR & D, perhaps even retroactively. There is no support, nor reason in principle, for such a complicated scheme in the regulatory language, which simply excludes effort "required in the performance

17. NNS's reliance on *Mayman* to support its reading of the regulation is not persuasive. The *Mayman* decision states that where a task is "simultaneously required by more than one *existing* contract" the defendant's argument "might be sound," and the contractor "might split the costs proportionally between the various contracts or bill the costs as indirect." *Mayman,* 894 F.Supp. at 222. Yet, this statement is unauthoritative and clearly dicta, as the defendant in *Mayman* did not have another existing contract. *Id.* Furthermore, the *Mayman* decision itself hardly endorses this reading of the FAR; indeed it notes in the preceding sentence that the defendant's interpretation "does not appear to be correct." *Id.*

of a contract." Instead, the more natural plain meaning of this phrase is that effort required in the performance of any contract cannot be IR & D, and that efforts required in the performance of multiple contracts are not, for that reason alone, IR & D chargeable to the government.[18]

■ The practical effect of this reading of the "required in the performance of a contract" exclusion is to create a temporal dividing line between IR & D and direct work that must be billed to a contract at the point the contract requiring the effort is signed. Prior to such a contract, the research and design effort is independent, and is eligible to be charged as IR & D, provided it otherwise fits the IR & D definition. Once a contract is signed, however, research and design efforts that are explicitly or implicitly required in the performance of that contract may no longer be charged as IR & D. Thus, for example, a shipbuilding contractor may engage in independent research and development to design a new radio antenna for a ship class and, provided other requirements are met, may charge that effort to IR & D. However, once a contract for such a ship is signed, any further radio antenna design effort that is incorporated into that ship may no longer be charged as IR & D, even if that further design effort benefits the entire ship class. And this is so whether or not the contract explicitly requires the shipbuilder to design the new radio antenna and whether or not the contract explic-

itly names the new radio antenna design as a "deliverable" of the contract. In sum, once a contract is signed the performance of which requires, implicitly or explicitly, a certain effort, that effort may thereafter no longer be charged as IR & D even if it also stands to benefit other existing contracts, potential future contracts, or a class design.

The regulatory history of FAR § 31.205–18 supports this plain language reading of the phrase "required in the performance of a contract." This phrase was added to the Armed Services Procurement Regulation (ASPR) by Defense Procurement Circular 90 (DC–90) in 1971. Prior to the addition of the phrase, the ASPR excluded from IR & D only that was "sponsored by a contract, grant, or other arrangement." 32 C.F.R. § 15.205–35(c) (1969). The government apparently considered this to be too narrow and proposed in a 1969 draft that the regulation be amended to exclude effort "sponsored by, or in support of, a contract or grant." An industry group, the Council of Defense and Space Industry Associations (CODSIA), opposed this formulation as overly broad, Ultimately, the government proposed to substitute the phrase "required in the performance of" for the phrase "in support of." [19] The stated purpose of this substitution was to indicate that "any work which must be accomplished in order to fulfill contractual requirements is a contract cost," not IR & D.[20] CODSIA objected to

---

**18.** The *Mayman* decision correctly rejects a yet more tenuous proposition, namely that an effort required by a contract may nonetheless be charged as IR & D so long as it offers a potential benefit to future contracts. *See Mayman,* 894 F.Supp. at 222. As *Mayman* noted, "scientific research is rarely so narrow that it fails to benefit other projects, and thus research inevitably benefits other contemplated contracts." *Id.*

**19.** *See* Thomas P. Barletta & Gerard E. Wimberly, Jr., Allowability of Independent Re-

search and Development Costs under FAR 31.205–18: A Proposal for Regulatory Reform, 29 Pub. Cont. L.J. 113, 115–118 (reviewing relevant regulatory history); *see also* J.M. Malloy, Depty. Asst. Sec. of Defense, Memorandum to ASPR Committee, "ASPR 68–14, Independent Research and Development (IR & D) and Bid and Proposal (B & P) Costs," at 181–82 (January 9, 1969).

**20.** *See* Malloy, *supra,* at 181.

this formulation as well, arguing that yet narrower language should be employed to exclude from IR & D only that effort "specifically required by contract provisions in performance of" a contract or grant.[21] This industry suggestion was rejected, and the "required in the performance of" language was implemented by DC–90 in 1971 and remains in effect in the current FAR.[22] Thus, the regulatory history plainly suggests not only that the "required in the performance of a contract" provision was intended to cover work implicitly required by a contract, but also that the industry recommendation that the exclusion be limited to efforts "specifically required by contract provisions" was considered and rejected.

The rejection of NNS's reading of the FAR also finds support in the regulation's purpose and intent. The purpose of government funding of certain IR & D efforts is apparent from the language in the regulation defining what types of IR & D are allowable as IR & D. In this regard, the FAR previously limited IR & D costs chargeable to the government to those projects "with a potential relationship to a military function or operation," 48 C.F.R. § 231.205–18(c)(1) (1990). Yet, this restriction was eliminated in 1991, and allowable IR & D costs are now

> limited to those for projects that are of potential interest to DOD, including activities intended to accomplish any of the following:
>
> (1) Enable superior performance of future U.S. weapon systems and components.
>
> (2) Reduce acquisition costs and lifecycle costs of military systems.

(3) Strengthen the defense industrial and technology base of the United States.

(4) Enhance the industrial competitiveness of the United States.

(5) Promote the development of technologies identified as critical under 10 U.S.C. 2522.

(6) Increase the development and promotion of efficient and effective applications of dual-use technologies.

(7) Provide efficient and effective technologies for achieving such environmental benefits as: Improved environmental data gathering, environmental cleanup and restoration, pollution reduction in manufacturing, environmental conservation, and environmentally safe management of facilities.

48 C.F.R. § 231.205–18(c)(iii)(B). Thus, allowable IR & D costs include not only those with a direct potential benefit to the military, but also those which strengthen the "defense industrial and technology base" and enhance "industrial competitiveness." In other words, the FAR indicates that the government intends, to a certain extent, to subsidize its contractors' general commercial research and development efforts in order to promote the strength, competitiveness, and efficiency of those contractors.

■ The exclusion from IR & D of those efforts "required in the performance of a contract" must be read in light of this general regulatory purpose. Clearly, then, it is not intended to preclude government subsidization of all commercial IR & D effort. Instead, it must be read to place reasonable bounds on the IR & D charges

---

21. *See* Barletta & Wimberly, *supra,* at 118.

22. A 1992 revision of the FAR changed the provision from "sponsored by, or required in the performance of a contract or grant" to

"sponsored by a grant or required in the performance of a contract," the current formulation. *See* 48 C.F.R. § 31.205–18; Barletta & Wimberly, *supra,* at 118.

the government will subsidize that are consistent with the general purposes of IR & D allowability as evidenced by § 231.205–18(c)(iii)(B). At the least, the "required in the performance of a contract" phrase must therefore be read to prevent double payment, that is, the subsidization by the government of efforts that will be paid for by an existing contract. If a contractor has already found a commercial customer who will pay for the particular research and design work, or signed a specific contract with the government to perform that work, there is no apparent purpose in providing further payment for that work in the form of IR & D reimbursements from the government. *See Mayman*, 894 F.Supp. at 221–22 (holding that IR & D is funded by the government "to support cutting edge research which is not 'sponsored by, or required in the performance of' any specific, existing contract" and that the phrase "required in the performance of a contract" should be read "to prevent ... intentional underbidding and cost shifting of contract-specific work to IR & D").[23]

Further, as the *Mayman* decision noted, the phrase "required in the performance of a contract" must be read to avoid "absurd situations" where the government would have no control over the amount and type of effort being charged as IR & D. *See Mayman*, 894 F.Supp. at 222, 223. In other words, the FAR clearly indicates the government's intent that allowable IR & D charges be limited and circumscribed; thus, any reading of the phrase "required in the performance of a contract" which renders IR & D charges essentially unbounded must be rejected as untrue to the regulatory intent.

In light of the apparent purpose of the phrase "required in the performance of a contract," NNS's claim that the explicit

language of the contract guides the IR & D determination is unpersuasive, because contractors are free to draft their contracts with commercial customers as they see fit and might choose to draft contracts in an artful manner to divert or pass on to the government the contract's research and design costs. For example, parties might draft commercial contracts that designated certain "deliverables," but remained silent on the research and development efforts necessary to produce those deliverables, thereby potentially rendering all such research and design efforts chargeable to the government as IR & D notwithstanding the fact that those efforts were necessary to build the ship. NNS's construction of the regulation allows contractors to render virtually all research and development IR & D, whether it was actually independent or not. Similarly, if the existence of multiple contracts that benefitted from a given design effort were sufficient to render that design effort IR & D, as NNS maintains, parties could manipulate the form and number of contracts to their advantage by favoring multiple contracts where possible. In this case, for example, NNS's agreement with Eletson to build four ships was formalized in four separate contracts with four different Eletson affiliates. It is unclear why NNS's decision to draft four contracts for four ships instead of one contract for four ships should be relevant to the question whether efforts necessary to build the four ships qualify as IR & D.

By contrast, the functional approach adopted here—reading the FAR to exclude from IR & D implicit as well as explicit requirements of a contract—not only comports with the plain language of the regulation and the regulatory history, but also

---

**23.** Of course, this anti-cost-shifting principal largely begs the question of what work is allowable as IR & D and what work is a

"contract-specific" work that should not be "shifted" to the government as IR & D.

helps avoid potential abuses of the IR & D system by rendering the IR & D determination less susceptible to artful contract design. Moreover, the result reached here sharpens the temporal dividing line between preliminary independent research and contract-specific work. Once a contract exists requiring the performance of a given research and design effort, that effort is no longer chargeable as IR & D. This dividing line comports with the purpose of the IR & D subsidization allowed by the FAR because the existence of a commercial contract requiring the research and design work at issue suggests that there is a commercial market demand for the work and the government no longer need subsidize it.

■ With the proper interpretation of the regulatory phrase "required in the performance of a contract" established, it remains to apply the regulation to the facts at bar. A review of the factual record, contested as it is, nonetheless indicates that NNS's treatment of the Double Eagle tanker IR & D charges were not, in the main, compliant with the FAR. The bulk of NNS's design efforts with regard to the Double Eagle tankers were clearly "required in the performance" of NNS's contracts with Eletson and Van Ommeren. It is undisputed that these contracts called for the delivery of ships whose design had not yet been completed. Thus, there is no question that a substantial portion of the Double Eagle research and design effort NNS charged as IR & D was necessary in order for NNS to perform the contracts requiring the delivery of Double Eagle tankers, and therefore these efforts should not have been charged as IR & D.

Indeed, it is doubtful whether the bulk of NNS's IR & D charges would have been allowable even were the FAR read to exclude from IR & D only those efforts explicitly required by the contract. Both the Eletson and the Van Ommeren contracts plainly and specifically required NNS to "*design*, construct, equip and complete" the tankers (emphasis added). The Eletson contracts further state that the contract price includes "the expenses for *basic designs* ..." (emphasis added). Thus, these contracts explicitly require NNS to design the ships, not simply construct them. NNS's arguments to the contrary are not persuasive.[24] In the end, it is clear that some design efforts charged as IR & D were both explicitly and implicitly required by the Eletson and Van Ommeren contracts and thus were improperly charged as IR & D.

NNS's efforts to establish "class designs" independent of the specific shipbuilding contracts do not change this analysis. Even assuming NNS was concurrently involved in a larger class design effort, intended to create International and Double Eagle ship designs for future contracts independent of the Eletson and Van Ommeren contracts, the fact that the research and design efforts required by the existing contracts would also benefit such class design efforts does not change the fact that those efforts were "required in the performance of a contract" and thus no longer chargeable as IR & D. In other words, the fact that given design efforts were required not only by the specific shipbuilding contracts but also by an internal effort to create an independent class design does not alter the fact that they were required in the performance of

24. NNS argues that the contract language regarding design simply indicated that NNS, not the purchasers, was responsible for supplying the design of the ships, and that NNS would retain the rights to the design after completion of the contracts. In other words, NNS contends that the design was not a "deliverable" of the contract. Even if true, this does not alter the fact that the contracts explicitly required NNS to design the ships.

an existing contract. NNS's independent class design efforts do not render the required efforts IR & D any more than the existence of an additional contract requiring the same effort would do so.

Although it is clear that NNS's general practice of charging Double Eagle research and design efforts as IR & D after NNS signed the Eletson and Van Ommeren contracts was not in compliance with the FAR, significant questions remain as to whether any of the efforts charged as IR & D were not required in the performance of those contracts and thus were chargeable as IR & D. In other words, factual questions remain whether NNS's Double Eagle IR & D charges were wholly in error or were at least partially accurate.

██ For example, a review of the record suggests that at least some of the disputed IR & D charges were proper because they were incurred before the existence of a requiring contract. Thus, the record indicates that Job Order 2858 was opened on May 12, 1994, eight days before the LOI between NNS and Eletson was signed on May 20, 1994 and more than five months before the Eletson contracts were signed on October 13, 1994. Thus, any costs charged to Job Order 2858 prior to October 31, 1994 predate the contract requiring the IR & D effort and are allowable as IR & D provided they are other-

wise qualified.[25] The amount of such costs is not clear on the current record. Similarly, NNS created IR & D Job Order 2875 on August 31, 1995 to charge efforts to design the Domestic Double Eagle tankers almost two months before the contracts with Van Ommeren requiring NNS to construct those tankers were signed on November 21, 1995. Again, the current record does not reflect to what extent Domestic Double Eagle design efforts, which were not required by the Eletson contracts, were charged as IR & D before the Van Ommeren contracts were entered into.

Furthermore, as noted above, the parties sharply dispute whether NNS was engaged in an independent effort to create "class designs" for tankers, or whether the "class design" efforts constituted a marketing effort which ceased with the assignment of actual contracts. This dispute is irrelevant to the majority of NNS's Double Eagle IR & D charges, as those efforts required by the shipbuilding contracts are not allowable as IR & D even if they also furthered a legitimate class design project. At the margins, however, the existence of a class design effort remains relevant. There may be efforts taken by NNS in furtherance of the class design beyond those required by the contracts which would be allowable as IR & D. For example, NNS contends that IR & D Job Order

---

**25.** The government asserts that the May 20, 1994 LOI is itself a contract which implicitly requires NNS to undertake the research and design efforts necessary to develop the concept design into a sufficiently detailed design to support the contract. Yet, the LOI simply reflects the parties' agreement "to continue good faith negotiations" toward a contract. This is merely an "agreement to agree in the future," and therefore, under Virginia law, not an enforceable contract. *See Beazer Homes v. VMIF/Anden Southbridge Venture, LP*, 235 F.Supp.2d 485, 490 (E.D.Va.2002); *W.J. Schafer Assoc., Inc. v. Cordant, Inc.*, 254 Va. 514, 519–20, 493 S.E.2d 512 (1997). Thus, while certain design efforts charged by

NNS after the LOI and prior to the contract may have been necessary to continue good faith negotiations with Eletson, they were not "required in the performance of a contract." The March 17, 1995 LOI between NNS and Van Ommeren contains a similar, non-enforceable agreement. *Cf. Bagley*, 2000 WL 33400196, at *2 (noting that the Memorandum of Agreement in that case was, by its terms, a legally binding contract which required the defendant to develop a fixed price proposal, and holding that efforts taken to fulfill that obligation were "required in the performance of a contract," and thus not chargeable as indirect B & P).

3102, for "Completion of Double Eagle Design," collected the costs of efforts to complete the Double Eagle designs for future sale or use, and that those efforts were not required by the Eletson and Van Ommeren contracts. NNS argues that by the time Job Order 3102 was opened in May 1998, the design efforts required by the Eletson and Van Ommeren contracts were substantially complete. For its part, the government contends that the charges under Job Order 3102 consisted of further efforts necessary to perform the shipbuilding contracts.

In sum, while it is clear that NNS's general practice of charging Double Eagle design efforts to the government as IR & D after signing contracts to build the Double Eagle tankers was impermissible under the FAR, there remain disputed issued of material fact regarding whether specific IR & D charges were nonetheless proper. Accordingly, by Order dated July 21, 2003, the government's motion for partial summary judgment was granted in part, insofar as the phrase "required in the performance of a contract" encompasses all efforts of a contractor that are necessary to perform a contract, whether or not those efforts are explicitly required by the contract in the statement of work or elsewhere and whether or not those efforts are also intended to benefit a "class design." See United States v. Newport News Shipbuilding, Inc., Civil Action No. 03–142–A (E.D.Va. July 21, 2003) (Order). Yet, because disputed issues of material fact remain regarding whether some of the costs charged by NNS as Double Eagle IR & D may be proper, the government's

motion for partial summary judgment was otherwise denied. In addition, NNS's motion for summary judgment on all counts, on the ground that all IR & D charging were proper, was denied. Id.

### III.

NNS has also moved for summary judgment on the FCA counts on the ground that the government has adduced no evidence in the voluminous summary judgment record sufficient to carry its trial burden of proving by a preponderance of the evidence that NNS "knowingly" submitted false claims.[26] To prevail on its motion for summary judgment, NNS must show that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering NNS's motion, the government's evidence must be viewed favorably, and all justifiable inferences drawn in its favor. See Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, the government must offer more than a mere scintilla of evidence supporting its claim that NNS acted knowingly; rather, the evidence must be sufficient that a reasonable factfinder could decide the knowledge issue in favor of the government. Id. at 248–51, 106 S.Ct. 2505.

■ The term "knowingly," for the purposes of the FCA, is defined to mean . . . that a person, with respect to information—

---

**26.** The government must ultimately show that NNS "knowingly present[ed] or cause[d] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (emphasis added). The government's related false claims counts also require proof that NNS acted "knowing-

ly," either in "mak[ing], us[ing] or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," or to "decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(2) & (7).

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729(b).[27] Thus, the government need not necessarily show that NNS actually knew that its claims for IR & D were false; the government may also prevail if it can show that NNS acted in "deliberate ignorance of" or "in reckless disregard of" the truth or falsity of the information.[28] Put differently, a showing that the claims were false does not obviate the need to show that the contractor actually knew the claims were false, or acted with reckless disregard or in deliberate ignorance of their falsity. Thus, NNS contends (i) that the ambiguity of the regulatory language renders it impossible for NNS to have had the requisite knowledge that its claims were false and (ii) that NNS's disclosure of the material facts regarding its IR & D policies to the government and its reliance on the advice of

professionals negate any notion that it acted with reckless disregard or deliberate ignorance of the falsity of its claims.

■ In considering the record on NNS's knowledge, it is important to note that there are two general categories of disputed IR & D costs at issue. The first category includes those costs which, according to NNS, were undertaken in furtherance of the independent class design effort, but which, based on the ruling here, may not be charged as IR & D because they were at least implicitly, if not also explicitly, required in the performance of the individual commercial shipbuilding contracts. The second category includes those costs which, according to the government, would not qualify as IR & D even under NNS's own interpretation of the FAR, or indeed under any reasonable interpretation of the FAR.

With regard to the second category, the government asserts that certain costs charged as IR & D included costs attributable to matters explicitly called for in the shipbuilding contract as a "deliverable" and thus not properly charged as IR & D under any interpretation of the FAR. For

27. Notwithstanding statutory language that refers to actual knowledge of the information, rather than actual knowledge of its falsity, the statute is nonetheless universally read to require actual knowledge of the falsity of the information or deliberate ignorance or reckless disregard of the truth or falsity of the information. *See, e.g., United States ex rel. Becker v. Westinghouse Savannah River Co.,* 305 F.3d 284, 288 (4th Cir.2002); *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed.Cir.1998); *United States ex rel. Oliver v. The Parsons Co.,* 195 F.3d 457, 464 (9th Cir.1999).

28. NNS, relying on Ninth Circuit precedent, argues for a more stringent formulation of the FCA intent requirement, namely that "the requisite intent is the knowing presentation of what is known to be false," *United States ex. rel. Hagood v. Sonoma County Water Agency (Hagood I),* 929 F.2d 1416, 1421 (9th Cir.

1991), and that "[t]he statutory phrase 'known to be false' does not mean incorrect as a matter of proper accounting methods, its means a lie." *Hagood v. Sonoma County Water Agency (Hagood II),* 81 F.3d 1465, 1478 (9th Cir.1996). Yet, this reading is not consistent with the statute, which clearly provides that deliberate ignorance or reckless disregard are sufficient. *See* 31 U.S.C. § 3729(b). Moreover, NNS's interpretation of the *Hagood I & Hagood II* holdings has been rejected in a more recent Ninth Circuit case, where that court noted that, "[w]hile some of our cases may contain extraneous comments that might be read out of context to suggest that the FCA requires an intentional lie to trigger liability," the statutory language controls and "deliberate ignorance" or "reckless disregard" is sufficient. *United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C.W. Roen Const. Co.,* 183 F.3d 1088, 1092–93 (9th Cir.1999).

example, NNS contracted with the American Bureau of Shipping (ABS) to perform certain tests, including the Dynamic Load Analysis, the Spectral Fatigue Analysis, and the SafeHull Analysis, on the Eletson ships. According to the government, these tests were both ship-specific and explicitly required by the Eletson contracts and yet, NNS billed the costs of these tests as IR & D. Similarly, the government asserts that the Eletson contracts explicitly required NNS to produce and deliver ship-specific "As–Built" drawings of the Eletson ships and that NNS improperly charged the cost of revising drawings to create the "As–Built" drawings as IR & D. The government also asserts that "a significant part" of the IR & D costs charged to Job Order 2858 were overtime charges required by the Eletson production schedule and hence were clearly contract-specific and not chargeable as IR & D under any reasonable interpretation of the FAR.

NNS disputes the factual bases of these assertions, arguing, in essence, that all of these charge were attributable to the independent class design and not contract specific. Moreover, the amount of IR & D charges attributable to any of these disputed efforts is not clearly stated in the current record. In short, there are factual disputes concerning whether NNS submitted claims for IR & D that included charges that were clearly improper under any interpretation of the FAR, including NNS's interpretation. Thus, with respect to this second category of disputed IR & D

costs, the government has clearly demonstrated that there is a triable issue of fact on whether NNS acted with the requisite "knowledge." Significantly, the parties dispute whether this second category even exists; but were the undisputed record to reflect any claim that included such charges, it would follow that in submitting such patently impermissible claims NNS acted, at the least, with "reckless disregard" and hence "knowingly."

 The issue of NNS's knowledge with respect to the first category of claims—those which might be have been allowable as IR & D had NNS prevailed on its interpretation of the FAR—is also not amenable to resolution on summary judgment. With regard to actual knowledge of the falsity of this category of claims, NNS contends that it could not have known they were false at the time they were submitted given the ongoing debate regarding the interpretation of the phrase "required in the performance of a contract." For its part, the government asserts that, given the plain meaning of the regulation, NNS must have known that its interpretation of the regulation was false. Yet, even assuming the government is correct that the phrase "required in the performance of" had a clear meaning at the time of the 1972 revision, the complete record indicates that the meaning of the phrase and its application have been the subject of considerable debate since the mid–1970s. Significantly, this debate unfolded not only between the government and industry, but among different governmental agencies, as well.[29]

**29.** The record indicates that the GAO's interpretation of the phrase began to diverge from the Department of the Defense's and the Navy's interpretation in the mid–1970s. In 1974, the GAO issued a Report to Congress criticizing Pratt & Whitney's charging of design efforts for commercial aircraft engines to IR & D. *See* GAO Report to Congress B–164912, "Independent Research and Development Allocations should Not Absorb Costs of Commercial Development Work" at i (December 10, 1974). The GAO concluded that the charges were improper because Pratt & Whitney had contracts to deliver the engines. *Id.* at 11. The GAO further asserted that "the 1972 revision excludes not only technical effort explicitly required by a research and development contract but also that effort implied by the terms of—that is, 'required in the performance of'—a production contract." *Id.* at 10–11. Thus, according to the GAO, "research and development ceases to be indepen-

The record further indicates that the debate regarding the proper interpretation of the regulatory phrase "required in the performance of a contract" has been an ongoing and unresolved question since that time.[30] As discussed *supra*, the *Mayman* decision set aside the explicit/implicit requirement issue without resolving it. *See Mayman*, 894 F.Supp. at 222. Nor has any other published opinion squarely addressed this question. Finally, the record contains no indication of consistent government enforcement of the FAR phrase "required in the performance of a contract" that might have signaled to NNS the proper interpretation of the phrase.

In sum, this history of agency and industry dispute and doubt over the proper interpretation and application of the FAR definition of IR & D arguably points persuasively away from a conclusion that NNS must have known, at any time between 1994 and 1999, that its general Double Eagle charging practices were in violation of the FAR.[31] Yet, the plain language

---

dent when the performer contracts to deliver a still-to-be-developed article to a purchaser's requirements." *Id.* at 11. In its comment on a draft of the 1974 GAO Report, the Navy agreed that the GAO's interpretation of the 1972 revision was correct, yet asserted that the post–1972 IR & D efforts charged by Pratt & Whitney were nonetheless properly charged as IR & D because they concerned engine improvements "over and above and beyond" what was "called for in existing commercial orders." *Id.* at 31.

A 1977 GAO Report indicates that the intergovernmental debate had widened. *See* GAO Report to Congress PSAD–77–57, "Need to Prevent Department of Defense from Paying Some Costs for Aircraft Engines That Contractors Should Pay" at 14–15 (February 28, 1977). This report noted that "contractors were unwilling to certify that their IR & D programs did not contain technical effort implicitly required by the terms of a contract" and that "contractors believe that 'implicitly' covers such a broad spectrum that almost any effort could be considered unallowable as IR & D." *Id.* at 14. For its part, the GAO rejected the contractors' concerns as unfounded and recommended that the FAR, then known as the ASPR, be revised to adopt specifically the "implicitly required" approach. *Id.* Notably, however, the DOD sided with the contractors, arguing that such a revision was inadvisable because it would "leave a great deal of impreciseness in the definition," and recommended awaiting the results of a "new ASPR study" which "may provide a better definition that will not be subject to misinterpration." *Id.* at 15. Thus, not only did the GAO and the DOD disagree about the best interpretation of the IR & D definition, both agencies believed by 1974 that the IR & D definition was ambiguous and ought to be clarified. Such clarification was never issued.

30. *See Mayman*, 894 F.Supp. at 222 (noting that "there is considerable debate over whether a particular task is 'required' by a contract and thus cannot be billed to IR & D"); Barletta & Wimberly, *supra* n. 8 at 118–19 (noting that "the split persists"); John W. Chierichella, IR & D vs. Contract Effort, 90–2 Costs, Pricing & Acct. Rep. 3, 8 (1990) (noting that "[t]o date, no amendment to the IR & D cost principle, and, for that matter, no decisional law, has definitively answered the questions that have engendered this sustained intra-Governmental debate and confusion").

31. A recent Eight Circuit case, *Minnesota Assoc. of Nurse Anesthetists v. Allina Health System Corp.*, 276 F.3d 1032 (8th Cir.2002), provides an illuminating contrast. In that case, the Eighth Circuit panel held that the defendants could not rely on a purported ambiguity in the relevant regulation allegedly created by a Health Care Financing Administration (HCFA) memorandum, when a further memorandum issued months later and received by the defendants unequivocally clarified the issue. *Id.* at 1053–54. The panel noted that "[i]f the Association shows the defendants certified compliance with the regulation knowing that the HFCA interpreted the regulations in a certain way and that their actions did not satisfy the requirements of the regulation as the HCFA interpreted it, any possible ambiguity of the regulations is water under the bridge." *Id.* at 1053. Unlike the *Minnesota Association* case, in this matter there is no evidence suggesting that the defendants received a definitive agency interpretation to resolve and remove the apparent ambiguity of the relevant regulation, which as

of the disputed provision and its legislative history suggest the contrary. Because the current record on this issue must be viewed in the light most favorable to the government as the non-movant[32] and because it is clear that this issue merits further factual development, it is therefore not amenable to summary disposition.

■ Similarly, a material factual dispute remains with respect to the question whether NNS acted with reckless disregard in submitting its Double Eagle IR & D claims. The government asserts that NNS acted with reckless disregard by proceeding to charge $74 million as IR & D based on a tenuous interpretation of the regulation without disclosing its interpretation to the government and verifying its accuracy. NNS, for its part, argues that its disclosure of its IR & D policies and its reliance on the advice of experts negate any notion that it acted with reckless disregard. A careful review of the record indicates that material factual questions remain concerning both issues and that summary judgment in favor of NNS is not warranted on the current record.

■ A contractor's disclosure of its accounting practices to the government is relevant, not because government knowledge of a misrepresentation shields a contractor from liability, but because evidence of disclosure may "point[ ] persuasively away from any conclusion that [the contractor] made a knowing misrepresentation." *X Corp. v. Doe*, 816 F.Supp. 1086, 1094 (E.D.Va.1993); *Becker*, 305 F.3d at 289 (holding that "we join our sister circuits and hold that the government's knowledge of the facts underlying an allegedly false statement can negate the scienter required for an FCA violation"). In other words, disclosure of accounting practices may establish that the defendant did

not "knowingly" submit false claims, but rather made "concerted and conscientious efforts to ensure compliance." *X Corp.*, 816 F.Supp. at 1093.

Disclosure is not required to avoid liability under the FCA in every instance where a contractor relies on an interpretation of a disputed or ambiguous regulation. Yet, the more questionable or tenuous the contractor's interpretation appears, the more likely a failure to disclose may serve as evidence that the contractor acted with the requisite reckless disregard of the regulatory propriety of its accounting procedures. Indeed, "when the contractor's purported interpretation ... borders on the frivolous, the contractor must raise the interpretation issue with the government contracting officials or risk liability under the FCA." *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1366 (Fed. Cir.1998). In other words, both the clarity of the regulation and the reasonableness of a contractor's interpretation are relevant in deciding whether a failure to disclose charging practices is indicative of a reckless disregard of their falsity.

An examination of the record on NNS's disclosure of its Double Eagle IR & D charging policy indicates that a material factual dispute remains regarding the nature and extent of any such disclosure. As earlier noted, NNS has submitted a series of documents intended to establish that NNS fully and properly disclosed its Double Eagle IR & D charging policies to the government. Yet, these documents fall short of conclusively establishing that disclosure occurred. For example, NNS's November 28, 1994 letter to the Naval Service Warfare Center (NSWC) states that NNS was intending to continue charging "the costs of this project" to IR & D; yet this letter does not mention the Elet-

---

noted above, dates back at least to the 1977 GAO Report to Congress.

**32.** *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

son contracts signed one month earlier, nor does it set forth the IR & D charging policy that NNS had developed by that time with regard to class design and contract-specific efforts.[33] Next, the March 15, 1995 version of NNS's IR & D Job Order 2858 sets forth NNS's Double Eagle IR & D charging policy, albeit in a somewhat convoluted manner, yet it too falls short by providing no indication that class design efforts were adjusted for, if not tailored to, the Eletson ships, nor does it reflect that a second class design would shortly be developed for the ships to be produced under the Van Ommeren contracts. And, while the record includes evidence of a February 21, 1996 discussion between NNS management and Tom Segroves of DCAA about Segroves' "concerns regarding IR & D," it is not clear that Segroves' IR & D concerns at this point were related to the Double Eagle IR & D charges. Finally, the record indicates that a detailed discussion occurred on July 8, 1997 between DCAA and NNS with regard to NNS's Double Eagle charging policies. Yet, the fact that the DCAA auditors at this meeting were posing basic questions and requesting documentation regarding Double Eagle IR & D practices is, at the least, a plausible basis to conclude that NNS had not disclosed its charging policy prior to that meeting, nor, indeed, prior to DCAA's initiation of an investigation of the Double Eagle IR & D charges. Thus, while NNS has made a substantial case for disclosure, the evidence in this record does not conclusively establish that NNS made a full, forthright disclosure to DCAA of its Double Eagle IR & D charging policies sufficient to contradict any finding that NNS was acting with reckless disregard with respect to the allowability of its Double Eagle IR & D charges under the FAR. Thus, the disclosure issue also merits further factual development.

Quite apart from disclosure, good faith reliance on the advice of counsel may contradict any suggestion that a contractor "knowingly" submitted a false claim, or did so with deliberate ignorance or reckless disregard. To establish the defense of good faith reliance on professional advice, a contractor must show (i) full disclosure of all pertinent facts to an expert, and (ii) good faith reliance on the expert's advice. *United States v. Butler*, 211 F.3d 826, 833 (4th Cir.2000). Clearly, if a contractor seeks the advice of counsel in good faith, provides full and accurate information, receives advice which can be reasonably relied upon, and, in turn, faithfully follows that advice, it cannot be said that the defendant "knowingly" submitted false information or acted with deliberate ignorance or reckless disregard of its falsity, even if that advice turns out in fact to be false. Yet, evidence of reliance on the advice of counsel and outside experts does not necessarily bar a fact-finder from finding that the contractor acted with reckless disregard; the contractor might have acted recklessly in relying on the advice because, for example, the advice may be shown to be patently unreasonable and thus not worthy of reliance or because the contractors' compliance with that advice was recklessly incomplete.

---

**33.** Significantly, NNS sent the November 28, 1994 letter to NSWC, not DCAA. Although NSWC ultimately forwarded the letter to DCAA, NNS's failure to address the letter to DCAA undermines the weight of this letter as evidence of disclosure. *See X Corp.*, 816 F.Supp. at 1094 (holding that disclosure evidence is relevant because of its implication with regard to scienter). In other words, because NNS did not direct the letter to DCAA, it is unclear (i) whether NNS is entitled to a favorable inference that it was not concealing its IR & D policy from DCAA or (ii) whether DCAA actually took notice of the letter.

The record on this question falls short of establishing conclusively that NNS relied in good faith on, and fully carried out, the advice of its in-house counsel and outside experts. This question, too, merits further factual inquiry at trial.

Although the parties agree that Keevan advised NNS that NNS should disclose its charging policies to the government,[34] it is unclear, as just discussed, whether such disclosure occurred. Until this question is resolved, it cannot be determined whether NNS in fact followed Keevan's advice in good faith. Additionally, the parties dispute whether NNS acted reasonably in relying on Keevan's three factor test and his application of the test to the Eletson contracts. The government contends that NNS's reliance on Keevan's test was reckless because the test is utterly without foundation. The government also argues that NNS was reckless in relying on Keevan's application of the test to the commercial tanker contracts, specifically Keevan's conclusion that the contracts did not explicitly call for design work, even though both sets of contracts specifically required NNS to *"design,* construct and complete" the tankers, and the Eletson contracts further specified that the contract price included "the expenses for *basic design* ..." (emphasis added). For its part, NNS contends that it was reasonable in relying on an expert with so much experience in the field. Finally, owing to the lack of a formal report detailing Arthur Andersen's conclusions and advice, the parties dispute both the content and the nature of the actual advice provided. NNS relies on testimony by Keevan and senior management, while the government relies on the contemporaneous Arthur Andersen outline memorandum. This dispute regarding the content of the advice is obviously material to the reliance issue.[35]

In sum, just as with the disclosure question, material factual disputes remain with regard to the reliance issue. In other words, NNS has failed to establish conclusively that it relied in good faith on the advice of its experts, while the government, for its part, has adduced sufficient evidence upon which a reasonable factfinder might conclude that NNS acted with reckless disregard as to the impermissibility under the FAR of its Double Eagle IR & D charges. Accordingly, NNS's motion for summary judgment on the FCA claims on the ground that the government failed to produce sufficient evidence to create a triable issue on the knowledge element of the FCA claims must be denied.

An appropriate order has issued.[36]

---

**34.** The parties differ concerning the force of the advice to disclose, with NNS arguing that it was advised only that it "should consider" disclosing its approach, while the government focuses on the statement in the memorandum indicating that NNS's approach is "theoretically appropriate (subject to the disclosure discussed below)."

**35.** Similarly, the lack of record evidence regarding the precise nature, content, and timing of Huneycutt's advice to NNS likewise leaves material questions of fact unsettled with regard to NNS's reliance on its in-house counsel's advice.

**36.** *See United States v. Newport News Shipbuilding, Inc.,* Civil Action No. 03–142–A (E.D.Va. July 21, 2003) (Order).